**BLUE PACIFIC MANAGEMENT CORP.,**
**Plaintiff/Counter-Defendant,**

**v.**

**MARTIN ANDERSON dba PAGO PLAZA,**
**Real Party in Interest, Defendant/Counter-Plaintiff.**

High Court of American Samoa
Trial Division

CA No. 76-01

January 12, 2004

Before RICHMOND, Associate Justice, SAGAPOLUTELE, Associate Judge, and TAPOPO, Associate Judge.

Counsel: For Plaintiff, Charles V. Ala'ilima
 For Defendant, Jennifer L. Joneson

OPINION AND ORDER

We separated the current action from a dispute between G.M. Meredith and Associates and Plaintiff Blue Pacific Management Corp. ("BPMC") as agent for Pago Plaza. On May 16, 1997, BPMC intervened on its own behalf and asserted distinct claims against Pago Plaza, with Defendant Martin Anderson ("Anderson") as a real party in interest. BPMC alleged

that Anderson owed payment for lease commissions, construction services, and reimbursements. Anderson counterclaimed for an accounting of revenue earned by charging for parking, a return of some personal property, and a rent payment. On April 22, 2003, Anderson moved for summary judgment based on the statute of limitations and argued for a Rule 12(b)(6) partial dismissal of BPMC's construction management service claims. After a May 8, 2003 hearing, the Court denied the summary judgment and dismissal motions, and deferred ruling on the statute of limitations issue until after trial.

For the reasons stated below, we find Anderson liable for the lease commissions, but the statute of limitations bars BPMC's other claims. In addition, we find that BPMC sufficiently accounted for the parking lot fees, but is liable for the rent payment. Anderson did not present any evidence that BPMC still possessed Plaza property.

### Factual Findings

A lawyer residing in Hawaii, Anderson constructed and owned Pago Plaza, a commercial property. James McGuire ("McGuire") of American Samoa, in his capacity as president of BPMC, acted as Anderson's agent, managing the Plaza from November 13, 1986 until February 1997. Anderson supervised McGuire using intermediary agents. Warren Hamamoto ("Hamamoto") supervised McGuire for approximately the first three years of the agency. Robert Kerley ("Kerley") supervised McGuire after Hamamoto until the end of the agency.

On September 3, 1986, as construction finished on the Plaza, Anderson hired McGuire for a term of three months to broker Pago Plaza leases. For every lease, McGuire earned a commission of one month's rent. McGuire performed his duties successfully, and the brokerage agreement developed into a long-term management agreement.

Agreeing orally, the parties embodied their management agreement in a detailed November 13, 1986 letter from McGuire to Hamamoto. McGuire promised 15 hours of management services a week, with specific duties including rent collection, complaint handling, security, maintenance, office and retail space leasing, and specific construction tasks. The letter detailed five forms of compensation: monthly salary; heavy equipment rental commissions; use of secretarial services; letter of recommendation; and lease commissions. McGuire received a salary of $1,000.00 per month and a lease commission worth the value of the lease's first month of rent, including common area charges.

Anderson and McGuire initially seemed satisfied with the terms of the management agreement. On February 9, 1990, Anderson executed a

power of attorney that authorized McGuire to manage and execute leases for Pago Plaza. McGuire closed some lucrative leases for Anderson, including two leases with the Federal Emergency Management Agency ("FEMA"), a 15-month February 15, 1990 lease in evidence, and a 3-month January 4, 1992 lease. Among other documents in evidence, McGuire's July 6, 1993 accounts receivable spreadsheet and February 16, 1994 letter show the existence and value of both leases. Including common area fees, monthly rent was $10,622.50 for the 15-month lease and $3,150.00 for the 3-month lease.

The agency relationship successively changed. McGuire managed obligations incurred by Anderson outside the scope of the established 1986 management agreement. The Plaza needed repair after a hurricane destroyed its original skylight. McGuire managed the construction of a sturdier replacement. Anderson's business opportunities outside of the Plaza needed developing. McGuire responded by managing a Lotopesega property development project and an industrial park warehouse proposal. As a new commercial property, Pago Plaza needed additional capital improvements to complete its establishment. McGuire managed the installation of an elevator, improvement of the office, and preparation work for the Plaza Café.

Likely in reaction to the need for the additional management work, Anderson tried to expand McGuire's duties on July 9, 1992, evidenced by a management responsibility outline. Though evidence implies that McGuire disputed the change in duties, the outline remains useful for demonstrating Anderson's intent. With the outline, Anderson intended to increase and generalize the scope of McGuire's construction management duties. Also, the outline shows that Anderson intended for McGuire to "charge non-tenants to park in the parking lot after 6 p.m., seven nights a week."

McGuire continued managing and leasing space at the Plaza without interruption. In 1993, he obtained a Government Services Administration ("GSA") lease deal, requiring a monthly rent of $10,778.40 for 10 years. The February 16, 1994 letter from McGuire includes a copy of the lease.

Acting on Anderson's behalf following GSA's occupation of its rental space, Kerley visited McGuire in American Samoa to resolve some outstanding issues that had developed, including the scope of McGuire's duties and his compensation. A July 20, 1993 letter of understanding written by Kerley summarized some results of the meeting and requested McGuire's signed acknowledgement. McGuire did not sign Kerley's letter, but he acknowledged the demands through performance. McGuire ceased using the services of H.F. McGuire Trust Corporation, a corporation in which his wife has interest, doing business as Mariani's, at the Plaza. Practically copying the duty list from the 1992 management

responsibilities outline, McGuire wrote a description of his duties for Anderson on February 11, 1994. In doing so, McGuire excluded some duties listed on the 1992 management responsibility outline, such as the supervision of independent contractors or the collection of parking fees.

After Kerley's July 1993 visit, McGuire's compensation changed considerably. McGuire started receiving a salary of $2,000.00 per month, shown by February 1994 correspondence between Anderson and McGuire. Anderson would only pay lease commissions on a case-by-case basis, as admitted by McGuire in an August 1, 1994 letter. Anderson also agreed in writing, as reflected in Kerley's December 19, 1995 letter, to pay McGuire for additional work beyond the scope of the Pago Plaza management duties, as long as McGuire received Anderson's prior approval.

Approximately concurrent with the compensation change, McGuire began requesting compensation that he considered due from Anderson. McGuire repetitiously made the same compensation requests over several years—these requests are the claims now before us. Anderson consistently responded by denying any duty that he had to pay any additional compensation. On the record, McGuire communicated to Anderson a first clear request for payment of the compensation claims with the July 6, 1993 accounts receivable spreadsheet faxed on August 7, 1993. A few months later, on February 16, 1994, McGuire insistently sent an invoice for the lease commissions with a request to negotiate a higher commission for the GSA lease. Anderson responded unequivocally. In a letter, Kerley wrote on February 14, 1994: "[w]e are unaware of any 'commissions and fees we owe you.'" Regarding the disputed lease commissions, Anderson wrote, "any extra payment is not in accordance with our prior understanding," in a February 22, 1994 letter. Anderson's denial of liability persisted in an August 26, 1994 letter and a July 27, 1997 phone conversation transcription.

In the stream of correspondence concerning McGuire's requests for compensation, a discussion of special consideration surfaced. McGuire requested special consideration from Anderson for the unpaid compensation demands to assist him in purchasing the Plaza. The 1997 phone conversation transcription records McGuire as stating, "I always felt that you'd show due consideration for the extra amount of time that I put in." On the record, Anderson never made such a promise. As stated in a January 24, 1996 letter, Anderson only promised to discuss "any special considerations that you [McGuire] feel are operating." Anderson never promised to sell the building to McGuire, as indicated by the February 22, 1994 letter and the 1997 phone conversation transcription.

In closing our factual findings, we note Anderson's and McGuire's other business dealings. Anderson and McGuire discussed but never finalized

an agreement to establish a sailing and water sport business near the Plaza. However, McGuire involved himself in a retail paint shop and a pizza restaurant, which both defaulted on loans from Anderson. Anderson gave a three-member partnership a $45,000.00 loan to establish the paint shop. McGuire, one of the partners, signed a $15,000.00 promissory note to Anderson, as evidenced by McGuire's testimony and letters dated February 14, 1994, and December 16, 1993. Following default, Anderson wrote to McGuire on February 23, 1993, stating, "[o]bviously I will carry you." However, McGuire made no promises to Anderson regarding the pizza restaurant's debt.

During the course of the agency, McGuire expended his own funds to further Anderson's interests. Between 1990 and 1993, McGuire incurred costs for a parking lot, an industrial park lot, some California trips, and an Apia trip. Some time in 1996, McGuire incurred $3,000.00 in costs for a well lease.

In 1995, McGuire arranged to charge for after-business-hour parking at the Plaza. Though the fees did not generate a profit and no one maintained accounting records, Anderson benefited from the parking charges. The manager of Sunset Security and McGuire credibly testified that the parking fees compensated Sunset Security for security services at the Plaza.

Towards the end of McGuire's agency with Anderson, McGuire arranged a reduced rate lease for his sister-in-law's company, Trophies & Things. The lease, in evidence, allowed for Trophies & Things to "administer" the parking lot after hours. McGuire disclosed his conflict of interest with his sister-in-law prior to signing the lease.

### Discussion

Throughout the discussion, we impute the actions of Hamamoto and Kerley to Anderson as agents with authority to supervise McGuire's management of Pago Plaza. *See generally* RESTATEMENT (SECOND) OF AGENCY § 27 (1957).

### I. Lease Commissions

We find McGuire entitled to the three lease commissions claimed. With a combination of letters, testimony, and copies of leases in evidence, McGuire sufficiently proves the two FEMA leases, the GSA lease, and his entitlement to lease commissions of the first month's rent. Summing the three commissions, we award him $24,550.90.

To establish McGuire's right to lease commission claims, he properly relies on the 1986 agency management letter, sent from McGuire and

accepted by Hamamoto for Anderson. The letter's compensation section terms include "[l]ease commissions paid on retail and office space equivalent to the first month's rent plus common area charges." We find that this written embodiment of their oral agreement describes the parties' compensation arrangement until sometime between July 1993 and February 1994, when Anderson and McGuire modified the terms of compensation. Correspondence concerning the commission change provides additional evidence of Anderson's lease commission promise. Acting for Anderson, Kerley affirmed McGuire's December 18, 1995 comment that "[m]y gross income got reduced by no longer being able to receive lease commissions . . . ." Kerley's December 19, 1995 affirmation reads, "[y]our letter is correct as far as it goes . . . ." In addition, McGuire wrote on January 9, 1995, "[p]rior to February, 1994, we had agreed to a commission for my services of one month's rent as compensation for a tenant signing a lease."

We interpret the 1986 management agreement as entitling McGuire to lease commissions for both new and renewed tenant leases. The relevant language of the 1986 agency management letter states, "[l]ease commissions paid on retail and office space . . . ." Anderson interprets the relevant language as applying only to new tenant leases. McGuire interprets the language as applying to all leases. We agree with McGuire. The plain language of the agreement makes no mention of new tenants. Until approximately eight years into their agreement, Anderson never mentioned a commission distinction between new and renewed tenant leases. For example, a February 22, 1988 letter in evidence records Anderson as paying $4,292.50 in commissions without verifying if the commissions were charged for new or renewed leases. Anderson first declared a lack of obligation to pay new tenant lease commissions in February 1994 when responding to McGuire's compensation requests for the FEMA and GSA leases. Therefore, we find Anderson obligated to pay commissions for leases of new and established tenants.

McGuire obtained the three leases under the compensation provisions of the 1986 management agreement. McGuire signed the two FEMA leases in 1990 and 1992. The GSA lease occurred before the compensation modification of July 1993. While the signatures on the contract are dated September 28, 1993, the contract indicates that GSA occupied the space starting from March 1, 1993. By occupying the space for the full month of March 1993, GSA committed to leasing the space for a sufficient length of time to entitle McGuire to his commission.

McGuire has no entitlement to a commission based on an industry standard. The parties only agreed on a commission of the first month's rent, as reflected in the 1986 agency management letter. Other letters, dated February 16, 1994 and February 22, 1994, only show negotiations

to create an exception for these specific leases; the parties never reached agreement.

 Anderson unpersuasively argues that the statute of limitations has run on McGuire's lease commission claims that accrued in the early 1990s. Anderson considers the lease commission agreement to be an oral, unwritten contract that has a three-year statute of limitations under A.S.C.A. § 43.0120(3). Finding another statute of limitations applicable, we disagree and recognize McGuire's lease commission claims. The statute of limitations "founded on written contracts" under § 43.0120(10) applies to the lease commission claims because, "where an instrument containing all the terms of a completed contract between the two parties is executed by one of the parties and accepted or adopted by the other, the instrument constitutes a contract in writing within the meaning of the applicable statute of limitation." *Pene v. Bank of Hawaii*, 17 A.S.R.2d 168, 171 (App. Div. 1990). The 1986 agency management letter includes the terms of a completed contract, "the subject matter, the parties, the terms and conditions, and the price or consideration." *Smith v. Skone & Connors Produce Inc.*, 26 P.3d 981, 985 (Wash. App. Div. 2001). The subject matter of the letter is "[McGuire's] contractual responsibilities at the Pago Plaza." McGuire signed the letter, and Hamamoto accepted the letter for Anderson. The letter describes Anderson as responsible for paying McGuire's salary. The letter's body gives a detailed description of McGuire's duties and compensation. Thus, with the agreement effectively founded on a written contract, a 10-year limitation of action applies. Regardless of when in the 1990s Anderson breached the agreement, the applicable statute of limitations does not bar McGuire's lease commission claims filed in 1997.

 Anderson argues that McGuire's willful and deliberate breaches of an agent's duty of loyalty bars McGuire from receiving unpaid compensation.[1] We disagree. An agent who willfully and deliberately breaches an agency contract is not entitled to compensation. *See* RESTATEMENT (SECOND) OF AGENCY § 469 (1957). A "willful and deliberate" breach is "a serious violation of a duty of loyalty or seriously disobedient conduct." *Id.* § 469 cmt. b. In cases of a less serious breach, we have the discretion "to allow compensation for valuable services rendered by a less than faithful agent." *Taylor v. Berkheimers, Inc.*, 618 P.2d 452, 455 (Or. Ct. App. 1980). Courts consider equitable principles when sustaining a principal's duty to compensate a disloyal agent. *See Johnson v. Pacific Lighting Land Co.*, 817 F.2d 601, 608 (9th Cir. 1987) (finding that the agent preformed the contracted services properly, and that a refund and damages were sufficient remedies for the principal); *Richardson v. Blue Grass Mining Co.*, 29 F.Supp, 658, 670 (E.D. Ky.

---

[1] In some cases, agents have been forced to disgorge compensation earned during times of disloyalty. Anderson makes no such claim here.

1939) (finding that denying the agent compensation would unjustly enrich the principal); *Taylor,* 618 P.2d at 455 (finding that the agent received no personal gain, that the agent's act was motivated by desire to benefit the principal, and that the agent was generally successful in serving the principal).

Considering the adequacy of McGuire's performance, Anderson's unjust enrichment, and the sufficiency of legal remedies available to Anderson, we find that McGuire retains his right to compensation. First, assuming that McGuire's actions were marginally disloyal, he performed his duties well enough to earn the promised compensation. McGuire breached no express condition of the agency agreement. The essence of each transaction challenged by Anderson was legitimate exchange. Mariani's conducted cleaning and maintenance services. Sunset Security provided security for the Plaza and parking lot. Though at a reduced rate, Trophies & Things paid valuable rent. The failed paint business and pizza restaurant loans were bad investments. Second, denying McGuire due compensation will lead to Anderson's unjust enrichment. McGuire performed the vast bulk of his duties properly. After over ten years of effortful service, the evidence shows, and we note, that McGuire established the Plaza as a well-respected commercial space in the Pago ·Pago community. Third, Anderson has sufficient remedies available to compensate him for any of McGuire's disloyalty. Anderson had ample opportunity to file claims or counterclaims against McGuire. We address below Anderson's right to a rent payment, an accounting for the parking lot fees, and a return of property. In totality, these three considerations show that McGuire's breach was less than willful and deliberate. McGuire retains his right to claim compensation from his agency with Anderson.

■ Anderson's remaining argument against McGuire's lease commission claims merits attention. Anderson argues that the doctrine of laches bars McGuire's recovery. We determine the applicability of laches "on a case by case basis and will usually bar recovery only if a party has voluntarily delayed asserting a right, and due to the delay, the opposing party's as well as the court's ability to ascertain the truth are harmed." *Passi v. America Samoa Bank,* 28 A.S.R.2d 130, 134 (Trial Div. 1995) (citations omitted). Here, Anderson fails to show any harm from McGuire's delay. A substantial volume of evidence allows Anderson and the Court to ascertain the truth.

## II. Construction Services Compensation

We find McGuire is not entitled to recover on his construction services claims because of the statute of limitations. McGuire claims compensation for his services from 1990 to 1993 for managing the skylight and elevator installations, the office improvement, the Plaza

Café preparation, the Lotopesega property project, and the warehouse proposal development. Anderson affirmatively defends himself using a three-year statute of limitations. He argues that the Court cannot enforce McGuire's construction service claims that accrued in the early 1990s when McGuire performed the services. We agree with Anderson's conclusion for different reasons.

■ McGuire's right to compensation derives from equity, which has a three-year limitation. *See* A.S.C.A. § 43.0120(7). Arguing that the service claims "related primarily to the time and effort given" while working as Anderson's general agent for managing the Plaza, McGuire relies on equitable principles of agency and implied contract as the basis for these claims. *See* 66 AM.JUR.2D *Restitution and Implied Contracts* § 24 (1973); 3 AM.JUR.2D *Agency* § 254 (1986). The construction service claims developed from McGuire's subsequent expectations and actions in reaction to new demands of the hurricane repair, the development of opportunities outside of the Plaza, and the major construction needs of the fledgling commercial property.

Moreover, the claims are outside the scope of the written 1986 management agreement. The parties did not address or contemplate Anderson's future construction service needs in 1986. The 1986 management agreement only lists specific construction supervision duties. The relatively precise construction duties of the 1986 management agreement letter include:

> 4. Supervise the completion of second floor construction.
> 5. Supervise completion of the Inspector General's Office on the first floor.
> 6. Supervise repair of the buildings [*sic*] generator,
> 7. Change schlage locks in building and get all glass doors re-keyed.

In comparison, the broad language of the 1992 management responsibility outline reads:

> 5. Correct Defects in Building Structure and Plant . . .
> 9. Be in Charge of Building Capital improvement Projects . . .
> 11. Supervise and Monitor independent Contractors while working on Premises . . .

Thus, the equitable construction service claims stand separate from the lease commission claims embodied in writing. Accordingly, the three-year statute of limitations for unwritten contracts applies to the equitable construction service claims.

The statute of limitations begins to run upon the accrual of a cause of action. 51 AM.JUR.2D *Limitations of Actions* §§ 107, 134. Contract and implied contract claims accrue when "breach of duty or contract has occurred." *Id.* § 107; *see* RESTATEMENT (SECOND) OF AGENCY § 455 cmt. c ("[s]tatutes of limitations, however, commonly run from the time of breach by the principal"). The date of accrual can also be described as from the date when "the plaintiff could have first maintained the action to a successful conclusion." 51 AM.JUR.2D *Limitations of Actions* § 107. Arguably, McGuire could have brought his claim against Anderson immediately after he completed each service. We would consider McGuire's action more likely to be successfully maintained after establishing a breach of implied contract duty, such as failure to pay or repudiation following a demand for payment. *See* RESTATEMENT (SECOND) OF CONTRACTS § 243(2) (1979). Anderson's repudiation first occurred on the record in the February 14, 1994 letter, which is the latest date that we could find an accrual of McGuire's construction service claims. However, this accrual date does not avail him of the Court's power to enforce his construction service claims. To avoid the bar of A.S.C.A. § 43.0120(7), McGuire must have filed before February 14, 1997. Mcguire's May 1997 filing came too late.

McGuire unpersuasively argues that his equitable construction service clams are part of a long-term agency agreement that Anderson breached when he terminated McGuire without paying all compensation due, as in *Afshar v. Procon Inc.,* 442 F. Supp. 587 (S.D.N.Y. 1977). In *Ashfar,* the court held that a statute of limitations barred an agent from bringing claims for unpaid compensation. *Id.* at 891. The *Ashfar* court found the accrual date to be the date of the agent's termination, the date of breach when the "plaintiff was wronged." *Id.* However, in this case, McGuire had no reasonable expectation of being paid by Anderson at the time of termination. Anderson had already wronged McGuire by not paying and repudiating any duty to pay for the construction services. For relief, McGuire should have filed his claims in a timely manner, at a time before his termination.

## III. Reimbursements

The statute of limitations has run on most of McGuire's reimbursement claims. McGuire claims reimbursement for costs incurred during his duties as Anderson's agent for the parking lot, the industrial park lot, some California trips, the Apia trip, and the well lease. McGuire became entitled to reimbursement upon discharging expenses for Anderson. *See* RESTATEMENT (SECOND) OF AGENCY § 438 cmt. c ("The right of reimbursement arises upon, and not until, payment is made by the agent, and the statute of limitations runs in the principal's favor from such time . . . ."); 3 AM.JUR.2D *Agency* § 250. All claims, except for the well lease claim, were incurred and accrued between 1990

and 1993. Thus, the claims for reimbursement filed in May 1997 came after the three-year filing window expired under the applicable statute of limitation. *See* A.S.C.A. § 43.0120(7).

McGuire's well lease reimbursement claim has merit and remains timely. McGuire expended $3,000.00 when working on the well lease in 1996, sufficiently shown by testimony at trial. Anderson offers no rebuttal evidence challenging the accuracy of the amount claimed. For the reasons stated above, none of Anderson's defenses bar McGuire from bringing this reimbursement cause of action.

## IV. Statute of Limitations Exception

Attempting to prevent the statute of limitations from blocking his reimbursement and construction service claims, McGuire posits multiple exceptions. We find none of the offered exceptions applicable.

McGuire argues that A.S.C.A. § 43.0127 tolls the statute of limitations for the construction service and reimbursement claims. Section 43.0127 provides, "the time during which a defendant is a nonresident of American Samoa shall not be included in the computation of any period of limitation." In this case, even though Anderson resides in Hawaii, the section does not apply.

 Many states have nonresident tolling statutes that stop statutes of limitation from running on claims against out-of-state defendants. Tolerated for years, broadly applied nonresident tolling statutes have fallen into disfavor. *See Bendix Corp. v. Midwesco Enter., Inc.,* 486 U.S. 888, 894 (1988) (holding that the Commerce Clause of the United States Constitution invalidated a similar Ohio nonresident tolling statute); *Compare McNamara v. McAllister* 130 N.W. 26, 28 (Iowa 1911) (applying Iowa's nonresident tolling statute, IOWA CODE ANN. § 614.1(6)) *with Vogt v. Miller,* 285 N.W.2d 1, 6-7 (Iowa 1979) (declining to apply Iowa's nonresident tolling statute). Interpreting the will of their legislatures, a majority of courts decline to apply tolling statutes to nonresidents "amenable to service of process and the jurisdiction" of the deciding court. *Frazier v. Castellani,* 342 N.W.2d 623, 626 (Mich. Ct. App. 1983); *see also Ankers v. Rodman,* 995 F. Supp. 1329, 1334 (D. Ut. 1997); *Shin v. McLaughlin,* 967 P.2d 1059, 1063 (Haw. 1988); *Tetzlaff v. Brooks,* 950 P.2d 1242, 1244 (Idaho 1997); *Vogt,* 285 N.W.2d at 6-7 (describing the test as one of "inescapability from service"); *Haton v. Haton,* 672 N.E.2d 962, 964 (Ind. Ct. App. 1997). Amenable to service means the defendant is subject to service under the law and is sufficiently available for a plaintiff to effectuate service. *See Shin,* 967 P.2d at 1063; *Tetzlaff,* 950 P.2d at 1244. We find interpretations of the Iowa and Indiana statutes particularly persuasive. Describing the out-of-state defendant with the term "nonresident," these statutes closely

resemble our own. IOWA CODE ANN. § 614.1(5) (West 1977); IND. CODE ANN. § 34-1-2-6 (West 1983). Courts find that the purposes of these statutes are to "protect the right of a plaintiff to bring an action and to prevent a defendant from defeating a claim by absenting himself from the jurisdiction." *Haton*, 672 N.E.2d at 964 *(quoting Frazier*, 342 N.W.2d at 626); *see also Bendix Corp.*, 486 U.S. at 894-95 (discussing the state interests for enacting these nonresident tolling statutes).

■ We consider the nonresident tolling statute inapplicable to Anderson under the facts of this case. American Samoa, far away from the continental United States, has a greater interest in the nonresident tolling statute than many other United States jurisdictions. American Samoa residents may more easily lose their claims against nonresidents due to distance and communication difficulties. In addition, defendants can more easily hide themselves from service. Nevertheless, we find that Anderson does not fall within the intended ambit of A.S.C.A. § 43.0127.

■ First, McGuire did not need the protection of the nonresident tolling statute, because our *in personam* jurisdictional power and service authorization statutes extend to Anderson off island. *See Haton*, 672 N.E.2d at 965. Section 3.0103(b) of the A.S.C.A. provides us with *in personam* jurisdictional power over Anderson, for he transacted business within the territory. From the weight of business transacted between Anderson and McGuire and from Anderson's business dealings at Pago Plaza, personal jurisdiction over Anderson "does not offend traditional notions of fair play and substantial justice." *Patau v. Rosendahl Corp.*, 16 A.S.R.2d 96, 99 (Trial Div. 1990) (citations omitted). With or without Anderson's consent, McGuire could serve Anderson with notice in Hawaii and bring him before an American Samoan court. A.S.C.A. §§ 43.0501, 43.0504. Anderson engaged in other litigation within the territory, concerning the destruction of the Plaza's original skylight, and kept in continual communication with McGuire, his agent.

■ Second, statutes of limitation are intended to "encourage promptness in the prosecution of actions and thus avoid the injustice which may result from the prosecution of stale claims." *Shin*, 967 P.2d at 1064 (quoting *Byrne v. Ogle*, 488 P.2d at 718); *see Ankers*, 995 F. Supp. at 1334. Allowing a virtually endless cause of action against nonresidents who will never come to American Samoa would interfere with the effectiveness of the statute of limitations. *See Shin*, 967 P.2d at 1064. Plaintiffs could wait until evidence, witnesses, or documents became unavailable to bring their claims, while "defendants could not know with any certainty when they would be safe from the threat of litigation." *Id.* at 1065 *(quoting Tarter v. Insco*, 550 P.2d 905, 911 (Wyo. 1976)). Allowing an unnecessary loophole in the statutes of limitation would be "absurd and illogical." *Shin*, 967 P.2d at 1066.

McGuire raises a concern about consistent interpretations of the term "nonresident" throughout the American Samoa Code. Though our holding here exempts Anderson from classification as a nonresident, our interpretation is in harmony with the consistent application of the long-arm statute and protects the integrity of the American Samoa statute of limitations. *See id.* at 1064 (construing the Hawaiian nonresident tolling statute for out-of-state defendants in conjunction with the Hawaiian long-arm statute).[2]

 Turning to another tolling statute, Anderson did not share a "continuous, open, concurrent account." A.S.C.A. § 43.0122. Claims on such accounts accrue "on the date of the last item therein." *Id.* Generally, "the mere relationship of an agent to his principal is not sufficient to entitle the agent to maintain a bill for an accounting against the principal." 3 AM.JUR.2D *Agency* § 248. Similarly, in this particular case we find that agent McGuire cannot maintain that he had an account with principal Anderson. The account was not concurrent, because it lacked mutuality. *See* BLACKS LAW DICTIONARY 17 (5th ed. 1979) (defining an account as "a detailed statement of mutual demands in the nature of debit and credit"). McGuire's invoices and accounts receivable spreadsheet, in evidence, record nonmutual obligations, showing only Anderson's debt. Moreover, Anderson had no duty to keep account of his dealings with McGuire. *See* 3 AM.JUR.2D *Agency* § 248.

 McGuire argues that either estoppel or waiver tolls the statute of limitation, due to the "special consideration" that Anderson promised. We disagree. Anderson's representations did not amount to estoppel or waiver. Waiver and estoppel both require that "the plaintiff did not exercise his right to sue and was led not to do so by the defendant's conduct." 51 AM.JUR.2D *Limitation of Actions* §§ 425 (waiver), 432 (estoppel). Anderson did not prevent McGuire from suing. Anderson never promised special consideration on the record, as demonstrated by the February 16, 1994 and February 22, 1994 letters. Also, after Anderson's repeated repudiations of any additional obligation to pay, McGuire was reasonably aware that Anderson had no intention to pay the requested compensation.

## V. Parking Lot Fees, Office Space Rent, and Property Return

 Anderson was due an accounting of the profit from the parking

---

[2] We hold A.S.C.A. § 43.0127 inapplicable in this case and save further interpretation of the statute for another day. Issues left open include, but are not limited to, whether § 43.0127 applies when an individual residing in American Samoa becomes liable for a cause of action and then moves elsewhere, *see Ankers,* 995 F. Supp. at 1331, or when only in rem jurisdiction is available.

lot fees that McGuire collected. An agent has a duty "to keep, and render to his principal, an account of money or other things which he has received or paid out on behalf of the principal." RESTATEMENT (SECOND) OF AGENCY § 382. When the principal proves the agent has breached this duty, the burden of proof shifts to the agent to prove that the income was paid or disposed of in accordance with the agent's authority. *See id.* § 382 cmt. e. Here, McGuire has the burden of showing that he spent the parking lot fees properly. McGuire used the fees to serve Anderson's interests. The testimony of McGuire and the manager of Sunset Security meet this burden by establishing that the fees were used to pay for security, which serves Anderson's interests. Anderson is not entitled to a damages award from McGuire's failure to record the details of the parking lot fees.

McGuire owes $760.00 for office space rent. The May 1, 1997 rent statement in evidence shows the amount due. McGuire makes no rebuttal to Anderson's evidence.

Anderson fails to offer any evidence that McGuire remains in possession of any Plaza property. Anderson does not meet his burden of proof to support this counterclaim.

## VI. Prejudgment Interest, Fees, and Costs

 McGuire and Anderson both request prejudgment interest. The award of prejudgment interest lies within the discretion of the Court. Generally, we exercise our discretion to deny a prejudgment interest award in three peculiar circumstances: "(1) plaintiff's delay in bringing the suit, (2) a genuine dispute regarding ultimate liability or the complexity of the factual and legal issues to be resolved, and (3) judgment in an amount substantially less than that claimed." *Interocean Ships, Inc. v. Samoa Gases Corp.,* 26 A.S.R.2d 28, 43 (Trial Div. 1994) (citations omitted). McGuire delayed bringing most of his claims for a significant length of time, so we deny the bulk of his prejudgment interest request. McGuire's well lease reimbursement and Anderson's rent claim fit into none of the three circumstances, so we grant prejudgment interest on these claims. McGuire is entitled to 6% annual interest on $3,000.00 from when the well lease reimbursement became due sometime in 1996. Without an exact date, we exercise our discretion and set the starting date of prejudgment interest at the last day of 1996, December 31st. Anderson is also entitled to 6% annual prejudgment interest on $760.00, from when the rent became due on May 1, 1997.

 Court costs are allowed to the prevailing party as matter of course unless the Court otherwise directs. T.C.R.C.P. 54(d); *Pago Petroleum Prod. v. Ye Ahn Moolsoan, Ltd.,* 29 A.S.R.2d 34, 37 (Trial Div. 1995). Winning the larger judgment, we logically consider McGuire as the

prevailing party. *Hillside Enter. v. Carlisle Corp.*, 69 F.3d 1410, 1416 (8th Cir. 1995). We award McGuire reasonable court costs.

██ We deny both parties' requests for attorney's fees. The general rule is against recovery of attorney's fees by a party that incurs them in enforcing a claim against another. *Interocean Ships, Inc.*, 26 A.S.R.2d at 41. We have awarded attorney's fees in instances where they have been required by statute, agreed to contractually, or where an opposing party has acted wantonly, oppressively, or in bad faith. *See Fiaui v. Faumuina*, 27 A.S.R.2d 36, 42 (Trial Div. 1994); *Jessop v. Hisatake*, 25 A.S.R.2d 12, 13 (Trial Div. 1993); *Samoa v. Gibbens*, 3 A.S.R.2d 121, 123 (Trial Div. 1986). Where no legal basis for an award of attorney's fees has been stated, we have denied a party's application therefore. *Samoa Products v. Pereira*, 3 A.S.R.2d 45, 46 (Trial Div. 1986). Neither party identifies a statutory or contractual basis for awarding attorney's fees. As discussed, we find none of McGuire's actions sufficiently devoid of bad faith to authorize a discretionary award of attorney's fees for Anderson.

### Conclusion and Order

1. Anderson is liable for the following damages:

| | |
|---|---|
| Lease Commissions | $24,550.90 |
| Construction Management Services | $00.00 |
| Reimbursements | $3,000.00 |
| Prejudgment Interest | 6% interest on $3,000.00 from December 31, 1996 |
| Court Costs | To be established with properly submitted affidavit |
| Attorney's Fees | $00.00 |

2. BPMC is liable for the following damages:

| | |
|---|---|
| Parking Lot Fees | $00.00 |
| Office Space Rent | $760.00 |
| Reimbursements | $00.00 |
| Prejudgment Interest | 6% interest on $760.00 from May 1, 1997 |
| Court Costs | $00.00 |
| Attorney's Fees | $00.00 |

Judgment shall enter accordingly.

It is so ordered.